UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WENDY SHERMAN,**

        **Plaintiff,**

                            **Case No. 2:22-cv-04161**

      **v.**                       **JUDGE EDMUND A. SARGUS, JR.**

                                        **Magistrate Judge Kimberly A. Jolson**

**PUBLIC EMPLOYEES RETIREMENT
SYSTEM,** *et al.*,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendant Ohio Public Employees Retirement System's ("OPERS") Motion for Judgment on the Pleadings ("OPERS's Motion") (ECF No. 12), and Defendants Kelli Manley and Jeremy Polley's (the "Individual Defendants") Motion for Judgment on the Pleadings (ECF No. 13). For the reasons stated herein, the Court **GRANTS** OPERS's motion in full (ECF No. 12), and **GRANTS** in part and **DENIES** in part the Individual Defendants' motion (ECF No. 13).

## BACKGROUND

This case arises from Plaintiff Wendy Sherman's ("Plaintiff") termination from employment with OPERS after a series of requests for leave due to personal health issues. (*See generally* Compl., ECF No. 1.) Taken as true, Plaintiff's factual allegations, in relevant part, are as follows:

Plaintiff began her employment with OPERS as a benefits claim processor in or about May 1997. (*Id.* at ¶ 19, PageID # 3.) OPERS is one of Ohio's statutorily-created public retirement systems that provides retirement, disability, and survivor benefits to employees working for public

employers throughout Ohio.  (Ohio Rev. Code Ann. § 145.03; OPERS's Mot. at 2, ECF No. 12 at PageID # 61.)

In February 2018, Plaintiff was diagnosed with myelodysplastic syndrome ("MDS"), which caused Plaintiff to experience fatigue, shortness of breath, and a compromised immune system.  (*Id.* at ¶¶ 23–25, PageID # 3.)  Due to her MDS, Plaintiff needed a stem cell transplant and chemotherapy.  (*Id.* at ¶ 26, PageID # 3.)  To have these procedures, Plaintiff requested and was approved for medical leave from OPERS pursuant to the Family and Medical Leave Act ("FMLA").  (*Id.* at ¶¶ 27–28, PageID # 4.)  After receiving her stem cell transplant, Plaintiff suffered from "graft versus host disease" and experienced deteriorated vision.  (*Id.* at ¶¶ 31–34, PageID # 4.)  Plaintiff requested and was approved for FMLA leave again.  (*Id.* at ¶¶ 35–37, PageID # 4.)  In January 2021, Plaintiff's doctor recommended that she take periodic breaks at work to avoid exacerbating her vision problems.  (*Id.* at ¶¶ 39–40, PageID # 4.)  Upon her doctor's recommendation, Plaintiff approached the Individual Defendants and requested approval to take breaks from work.  (*Id.* at ¶¶ 46–48, PageID # 5.)

Plaintiff alleges the Individual Defendants gave her a disciplinary warning after she requested an accommodation.  (*Id.* at ¶¶ 49–58, PageID # 5.)  The Individual Defendants allegedly stated that the reason for Plaintiff's disciplinary warning was for a "no-call no-show absence." (*Id.* at ¶ 51, PageID # 5.)  Plaintiff alleges that she had no such absences, and the absence that the Individual Defendants referred to occurred during Plaintiff's FMLA leave.  (*Id.* at ¶¶ 52–53, PageID # 5.)  A few months later, Plaintiff was terminated.  (*Id.* at ¶ 59, PageID # 5.)  Plaintiff alleges that she was warned and terminated in retaliation for requesting a disability accommodation, having a disability, and taking medical leave.  (*Id.* at ¶¶ 57, 81–84, PageID # 6–7.)  Defendants deny when the accommodation was requested, the order of events leading to

Plaintiff's termination, and the reasons for terminating Plaintiff's employment. (Defs. Answer at ¶¶ 48–51, ECF No. 11 at PageID # 50–51.)

After filing a Charge of Discrimination with the Equal Employment Opportunity Commission and obtaining a Right to Sue letter, Plaintiff filed the present action on November 23, 2022, alleging violations of the Americans with Disabilities Act ("ADA"), FMLA, and Ohio's comparable Fair Employment Practices Act ("FEPA"). (Compl., ECF No. 1.) Defendants filed their Answer on February 6, 2023. (Defs. Answer, ECF No. 11.) On the same day, OPERS and the Individual Defendants filed separate Motions for Judgment on the Pleadings. (ECF Nos. 12, 13.) The Motions are fully briefed and ripe for this Court's review. (Pl. Resp., ECF Nos. 14, 15; Defs. Replies, ECF Nos. 18, 19.) The Court addresses both OPERS's and the Individual Defendants' motions in this Order.

## STANDARD OF REVIEW

OPERS moves for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c) and 12(b)(1). (ECF No. 12.) The Individual Defendants move for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c), 12(b)(1), and 12(b)(6). (ECF No. 13.) The Court discusses each of these Rules' standards of review.

## I.    Federal Rules of Civil Procedure 12(c) and 12(b)(6)

The Federal Rules of Civil Procedure provide that, "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a Rule 12(c) motion for judgment on the pleadings is identical to the standard for a motion to dismiss under Rule 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). To state a claim upon which relief may be granted, plaintiffs must satisfy the pleading requirements set forth in Rule 8(a). While Rule 8(a)(2) requires

a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (clarifying the plausibility standard articulated in *Twombly*). Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

## II.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle to assert Eleventh Amendment immunity. *Lee Testing & Eng'g Inc. v. Ohio DOT*, 855 F.Supp.2d 722, 725 (S.D. Ohio 2012). Defendants moving under this Rule have two options—a facial attack of the pleadings, or a factual attack. *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). In deciding the merits of a facial attack under 12(b)(1), "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Thus, a facial attack on the pleading under Rule 12(b)(1) mirrors the standard of review on a motion brought under Rule 12(b)(6).

"[W]hen a court reviews a complaint under a factual attack, . . . no presumptive truthfulness applies to the factual allegations . . . [and the] district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). "The entity asserting

Eleventh Amendment immunity has the burden to show that it is entitled to immunity, i.e., that it is an arm of the state." *Guertin v. State*, 912 F.3d 907, 936–37 (6th Cir. 2019) (quoting *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010)).

## ANALYSIS

Plaintiff brings five Counts against OPERS: disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count I); disability discrimination in violation of Ohio Revised Code § 4112.01 *et seq.*, otherwise known as Ohio's Fair Employment Practices Act ("FEPA") (Count II); retaliation in violation of the ADA (Count III); retaliation in violation of FEPA (Count IV); and retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count V). (Compl. at 7–10, ECF No. 1 at PageID # 7–10.)

Plaintiff brings three Counts against the Individual Defendants: retaliation in violation of FEPA (Count IV); retaliation in violation of the FMLA (Count V); and unlawful aiding, abetting, and inciting of discrimination under FEPA (Count VI). (*Id.* at 9–11, PageID # 9–11.)

Two motions sit before the Court: OPERS's Motion for Judgment on the Pleadings (ECF No. 12) and the Individual Defendants' Motion for Judgment on the Pleadings (ECF No. 13). The Court will first address OPERS's Motion before turning to the Individual Defendants' Motion.

## I. OPERS's Motion

OPERS argues three points in its Motion: (1) the Eleventh Amendment divests this Court of subject matter jurisdiction over Plaintiff's ADA and FMLA claims; (2) in the absence of a viable Federal claim, the Court should decline supplemental jurisdiction over Plaintiff's state law claims; and (3) the Eleventh Amendment bars Plaintiff's claims against OPERS for alleged violations of the Ohio FEPA. (OPERS's Mot. at 3–6, ECF No. 12 at PageID # 62–65.)

All of OPERS's arguments stem from its claimed sovereign immunity. To determine whether the Eleventh Amendment divests this Court of subject matter jurisdiction over Plaintiff's

ADA and FMLA claims against OPERS, the Court must first determine whether Congress has abrogated sovereign immunity for the States generally regarding ADA and FMLA claims. Second, the Court must determine whether OPERS is an "arm of the state" entitled to the same immunity given to the State of Ohio. Third, the Court considers whether OPERS is entitled to sovereign immunity from Plaintiff's state law claims.

### A.  Abrogation of State Sovereign Immunity

First, the Court considers whether Congress abrogated the States' Eleventh Amendment sovereign immunity for lawsuits pursuant to the (1) ADA; and (2) FMLA. The Eleventh Amendment states in full:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI; *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 531 U.S. at 363 (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000)). The Eleventh Amendment also prohibits suits brought by citizens against their own States. *Id.* (collecting cases).

There are limited circumstances where Congress may abrogate sovereign immunity. Congress can abrogate sovereign immunity if it passes a law pursuant to its authority under the Fourteenth Amendment to the United States Constitution; it cannot abrogate sovereign immunity by passing a law pursuant to its commerce power under Article I. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment."); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 72–73 (1996); *Kimel v. Fla. Bd. of*

6

*Regents*, 528 U.S. 62, 78–79 (2000) ("Congress lacks power under Article I to abrogate the States' sovereign immunity."). Moreover, Congress's authority to abrogate sovereign immunity pursuant to the Fourteenth Amendment is limited to remedying widespread patterns of discrimination. *Compare Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 735–36 (2003) (Congress had authority to abrogate sovereign immunity with respect to widespread pattern of gender-based discrimination), *with Garrett*, 531 U.S. at 374 (Congress did not have authority to abrogate sovereign immunity with respect to disability-based discrimination). Thus, whether Congress had constitutional authority to abrogate sovereign immunity is a statute-specific inquiry.

The Court now considers whether the ADA and FMLA abrogated the States' sovereign immunity. Precedent demonstrates that the States are entitled to Eleventh Amendment sovereign immunity from Plaintiff's ADA and FMLA claims.

### 1. Whether the ADA Abrogated Sovereign Immunity

Plaintiff alleges two violations of the ADA. Count I alleges Plaintiff was unlawfully terminated on the basis of her disability, and Count III alleges she was retaliated against for requesting a disability accommodation. (Compl. at ¶¶ 86–96, 108–114, ECF No. 1 at PageID # 7–9.) These Counts allege violations of multiple ADA provisions governing discrimination. Title I of the ADA prohibits discriminating against employees on the basis of their disability. 42 U.S.C. § 12112(a) ("Title I"). Title II of the ADA prohibits discriminating against individuals in public services. 42 U.S.C. § 12132 ("Title II"). Title V prohibits retaliation against individuals who have opposed any discriminatory act or practice made unlawful under the ADA. 42 U.S.C. § 12203(a) ("Title V").

The Supreme Court has held that only *some* provisions of the ADA properly abrogated sovereign immunity. Claims for money damages due to violations of Title I—employment

discrimination—are barred by sovereign immunity. *Garrett*, 531 U.S. at 360. Claims for money damages arising from violations of Title II—access to public services—are not barred by sovereign immunity so long as they are based on conduct that violates the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").

The Court construes Plaintiff's Count I as a Title I claim for employment discrimination. Although Plaintiff does not specify which Title of the ADA she bases Count I on, her allegations relate entirely to employment discrimination on the basis of her disability. (Compl. ¶¶ 86–96, ECF No. 1 at PageID # 7–8.) Accordingly, Count I alleges an ADA Title I claim regarding employment discrimination. Because the Supreme Court has held claims for money damages arising from violations of Title I of the ADA are barred by Eleventh Amendment sovereign immunity, the state of Ohio is immune from Count I. Thus, Count I is barred to the extent it is made against the State of Ohio and all of its entities considered "arms of the State."

Plaintiff's Count III alleges retaliation in violation of the ADA. The Supreme Court and the Sixth Circuit have not established whether Title V retaliation claims are barred by sovereign immunity. *Cook v. Garner*, No. 19-5931, 2020 WL 4876309, at *3 (6th Cir. June 17, 2020) ("[N]either we nor the Supreme Court has decided whether Title V of the ADA abrogates state sovereign immunity.").

District Courts within the Sixth Circuit have determined whether a State is entitled to Eleventh Amendment sovereign immunity for a Title V retaliation claim by extending the same sovereign immunity status associated with the underlying discrimination. *See, e.g.*, *Carnes v. Ohio Dep't of Tax'n*, No. 2:21-CV-03975, 2022 WL 4182356, at *5 (S.D. Ohio Sept. 13, 2022)

("[C]ourts within the Sixth Circuit have held that whether a state is immune from an ADA Title V retaliation claim flows from the state's immunity status on the underlying claim."); *McCollum v. Owensboro Cmty. & Tech. Coll.*, No. 4:09CV-00121-M, 2010 WL 5393852, at *3 (W.D. Ky. Dec. 22, 2010) ("Applying the Title I and Title II conditions on liability to Title V ensures state employers receive the degree of protection Congress intended. If a state is immune from underlying discrimination, then it follows that the state must be immune from claims alleging retaliation for protesting against discrimination.") (quoting *Chiesa v. New York State Dep't of Labor*, 638 F.Supp.2d 316, 323 (N.D.N.Y. 2009)).

Put simply, if a plaintiff's retaliation claim is based on a predicate violation of Title I regarding employment discrimination, then her Title V retaliation claim will be barred by sovereign immunity. *Carnes*, 2022 WL 4182356, at *5 ("Because this Court finds that [the defendant] is immune from the Title I claim at issue in this case, sovereign immunity also bars any Title V claims based on that same conduct.").  If a plaintiff's retaliation claim is based on a predicate violation of Title II regarding public access discrimination, then the plaintiff's Title V claim will *not* be barred by sovereign immunity. *See, e.g.*, *McCollum*, 2010 WL 5393852, at *3 ("[B]ecause the State is not immune from an underlying Title II discrimination claim, the State is also not immune from [the plaintiff's] claim alleging retaliation due to her opposition of that conduct.").  The Court agrees with the approach taken by its sister courts within the Sixth Circuit and applies the same analysis here.

Plaintiff's Title V claim for unlawful retaliation is predicated upon the same facts that form her employment discrimination claim.  Plaintiff alleges she was retaliated against for requesting a disability accommodation in the course of her employment.  (Compl. at ¶¶ 109–114, ECF No. 1 at PageID # 9.)  She alleges she was terminated due to this request.  (*Id.*)  Therefore, her Title V

retaliation claim is based upon alleged employment discrimination in violation of Title I.  The Court applies the same immunity to Plaintiff's Title V retaliation claim as it does to Plaintiff's Title I employment discrimination claim.

To the extent Plaintiff's ADA claims—Counts I and III—are brought against an arm of the State of Ohio, they are barred by sovereign immunity.

### 2.      Whether the FMLA Abrogated Sovereign Immunity

The Court now turns its attention to Plaintiff's FMLA claim.  In Count V, Plaintiff alleges OPERS retaliated against her in violation of the FMLA.  (Compl. ¶¶ 122–27, ECF No. 1 at PageID # 10.)  The FMLA governs both "family care" and "self-care" leave.  *See* 29 U.S.C. § 2612. "Family care" leave is leave taken to attend to childbirth, attend to adoption or foster care, or care for one's spouse, children, or parent.  *Id.* at § 2612(1)(A)–(C).  "Self-care" leave is leave taken to attend to one's own serious health condition.  *Id.* at § 2612(1)(D).

Like the ADA, the Supreme Court has held that Congress validly abrogated state sovereign immunity under only *some* provisions of the FMLA.  The Supreme Court distinguished claims brought pursuant to the "self-care" provision of the FMLA from those brought pursuant to the "family care" provision, holding that plaintiffs may only recover damages for claims brought pursuant to the latter.  *Compare Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 735–37 (2003) (holding that Congress constitutionally abrogated sovereign immunity for claims seeking money damages for violations of the "family care" provision), *with Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 37 (2012) (holding that the "self-care" provision did not validly abrogate state sovereign immunity).

Here, Plaintiff alleges violations of the "self-care" provision of the FMLA.  Plaintiff took FMLA leave to undergo personal medical procedures relating to her own existing medical

condition and worsening vision. (Compl. at ¶¶ 23–38, 123–25, ECF No. 1 at PageID # 3–4, 10.) Plaintiff does not allege to have taken leave to care for children or immediate family members. (*See generally id.*) Accordingly, the Court construes Count V as an FMLA claim for violations of the "self-care" provision. Because the Supreme Court has held such claims are barred by the doctrine of sovereign immunity, this Court lacks subject matter jurisdiction over Plaintiff's Count V to the extent it is alleged against arms of the State of Ohio.

**B.      Whether OPERS is an "Arm of the State" entitled to Ohio's Sovereign Immunity**

Having found that Plaintiff's ADA and FMLA claims are barred against the States, the Court now considers whether OPERS is entitled to Ohio's Eleventh Amendment sovereign immunity. Application of Sixth Circuit precedent to the facts of this case demonstrates that OPERS is entitled to the same sovereign immunity Ohio enjoys.

Sixth Circuit caselaw distinguishes a public entity that is an "arm of the State" from mere political subdivisions, finding that only the former is entitled to immunity under the Eleventh Amendment. *Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 324–25 (6th Cir. 2010) (citing *Ernst v. Rising*, 427 F.3d 351, 364–65 (6th Cir. 2005)). Political subdivisions such as counties and cities do not receive sovereign immunity protection under the Eleventh Amendment. *Id.*

To determine whether a public entity is an "arm of the State," courts in the Sixth Circuit consider four factors: "(a) the State's potential liability for a judgment against the entity; (b) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (c) whether state or local officials appoint the board members of the entity; and (d) whether the entity's functions fall within the traditional purview of state or local government." *Ernst*, 427 F.3d at 359 (citing *Hess v. Port Auth. Trans-Hudson Corp.*,

513 U.S. 30, 44–45, 51 (1994)) (citations omitted). "The caselaw analyzing Eleventh Amendment immunity has not treated the *Ernst* factors, or the considerations relevant to any one of them, as a checklist that must be satisfied to establish immunity. Rather, the *Ernst* factors are weighed and balanced against each other based on the unique circumstances of the case." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 777–78 (6th Cir. 2015) (citing *Perry v. Se. Boll Weevil Eradication Found., Inc.*, 154 F. App'x. 467, 472 (6th Cir. 2005)).

The Court considers the four *Ernst* factors in turn. Weighing all these factors demonstrates that OPERS is an "arm of the State" entitled to Ohio's sovereign immunity under the Eleventh Amendment.

### 1.     Ohio's Potential Liability for a Judgment Against OPERS

First, the Court considers the State Treasury's potential liability for a judgment against OPERS. *Lowe*, 610 F.3d at 325; *Ernst*, 427 F.3d at 359 ("[I]t is the state treasury's potential legal liability for the judgment, not whether the state treasury will pay for the judgment in that case, that controls the inquiry."). As the Sixth Circuit has stated, this is the "foremost factor" of the four. *Id.* (citing *Ernst*, 427 F.3d at 359). To determine the extent of the State Treasury's potential liability, the Court may consider publicly available information, including case law, statutes, and legislative history. *Dennis v. State Tchrs. Ret. Bd.*, No. 1:19-CV-386, 2021 WL 3630513, at *4 (S.D. Ohio Aug. 17, 2021) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). The Court is not bound to the allegations within the Complaint alone. *Id.*

Before discussing the potential liability of Ohio's state treasury, the Court begins with an overview of how OPERS operates. OPERS is the state retirement system for public employees in Ohio. *See generally* Ohio Rev. Code Ann. § 145. Public employees—those employed by state universities, boards, bureaus, commissions, administrative bodies, other state entities and political

12

subdivisions—contribute money towards OPERS for long-term retirement benefits. *Id.* at § 145.01(A)(1), 145.47. Public employers also contribute money towards OPERS. *Id.* at § 145.01(D), 145.48. The State Treasurer is the custodian of OPERS's funds and must deposit a "bond in such amount as is fixed by the governor" with the secretary of state. *Id*. at § 145.26. If funds of OPERS are not needed for immediate use, the Ohio Treasurer must deposit such funds "in the same manner as state funds are deposited, and subject to all laws with respect to the deposit of state funds." *Id.* Ohio Revised Code § 145.04 vests administrative and managerial duties of OPERS in the "public employees retirement board" (the "Board").

A review of how OPERS receives its funds and administers payments demonstrates that a monetary judgment against OPERS would create potential liability for the State Treasury. Each year, the OPERS Board estimates the amount necessary to "defray the expenses of the administration of [OPERS] in the ensuing year." Ohio Rev. Code Ann. § 145.54. If OPERS lacks funds sufficient to administer its system, the OPERS Board may transfer any remaining amount required for the expense fund from the "employer's accumulation fund." *Id.*, § 145.23(B) ("The employers' accumulation fund is the fund in which shall be accumulated the reserves for the payment of all pensions and disability benefits payable as provided in this chapter."). Those public employers are funded, in part, by the State Treasury, and the employers are required to make payments to OPERS. *Id*. at § 145.47(B), 145.48. For example, the Ohio Department of Rehabilitation and Correction ("DRC") is one of Ohio's state agencies, and thus an employer responsible for contributions to OPERS. *Id.* at § 145.01(D). DRC receives 96% of its budget from the state General Revenue Fund ("GRF").[1] The GRF is a state fund in the State Treasury, and it

---

[1] Department of Rehabilitation and Correction, *Greenbook LBO Analysis of Enacted Budget*, Legislative Budget Office of the Legislative Service Commission (Aug. 2021), Page 1, accessed at https://lsc2023.lsc.ohio.gov/documents/budget/134/mainoperating/greenbook/DRC.PDF.

holds all moneys deposited with the treasurer of state.  Ohio Rev. Code Ann. § 113.09. Accordingly, the money provided to OPERS from state agency employers—like DRC—will often be funds originating from the State Treasury.

This Court recently held that a similar tracing of funds back to the State Treasury demonstrated potential liability for the State Treasury when evaluating whether the State Teachers Retirement Board ("STRB") is an "arm of the State." *Dennis*, 2021 WL 3630513, at *3–6.  The STRB manages the State Teachers Retirement System ("STRS")—a smaller retirement system than OPERS that operates specifically for teachers.  While not the same entity as OPERS, STRS and OPERS share many similarities in their respective statutory framework.  *Compare* Ohio Rev. Code Ann. § 3307.01 *et seq*., *with* Ohio Rev. Code Ann. § 145.01 *et seq*.  The *Dennis* opinion is not binding, but its analysis is persuasive.  There, the Court found that "employer contributions to the STRS flow from the State treasury to the employer to the STRS" and created a potential liability for the State Treasury.  *Dennis*, 2021 WL 3630513, at *5.

Like the STRS in *Dennis*, employer contributions from state agencies can flow from the State Treasury to employers to OPERS.  *Dennis*, 2021 WL 3630513, at *5 ("If employers cannot satisfy such contributions, potential liability of the State may trigger.").  And, as with the STRS, Ohio Revised Code specifically contemplates payments to OPERS from the State Treasury.  Ohio Rev. Code Ann. § 145.70 ("All amounts due the public employees retirement system from the state treasury pursuant to this chapter shall be promptly paid upon warrant of the director of budget and management pursuant to a voucher approved by the director."); *Dennis*, 2021 WL 3630513, at *5 ("Money is still potentially flowing from the State treasury, warranting immunity.").  Accordingly, money passes from the State Treasury to state employers, and from state employers to OPERS,

14

creating potential liability for the State Treasury. This first factor weighs in favor of finding OPERS as an "arm of the State."

    **2. Statutory Language Governing OPERS and Ohio's Ability to Exercise Control over OPERS**

  Second, the Court reviews the provisions of the Ohio Revised Code governing OPERS, with a heightened focus on Ohio's ability to exercise control over OPERS.

  Reviewing the Ohio Revised Code provisions creating and governing OPERS demonstrates the myriad of ways Ohio can exercise substantial control over OPERS. OPERS is required to consult with the Ohio Secretary of State regarding administering elections to OPERS's Board. Ohio Rev. Code Ann. § 145.058(A). OPERS's Board members must take an oath to support the constitution of the state. *Id.* at § 145.07. Moreover, the Board is subject to open meetings pursuant to the Ohio Open Meetings Law. *Id.* (referencing Ohio Rev. Code Ann. § 121.22). The Board has to submit its ethics policy for approval from the Ohio Ethics Commission. *Id.* at § 145.093. The Ohio Attorney General is the Board's legal advisor. *Id.* at § 145.10. The Board must also submit its budget to the Ohio retirement study council. *Id.* at § 145.092. The Ohio retirement study council consists of three Ohio Senators, three Ohio Representatives, and three members appointed by the Governor with the advice and consent of the Ohio Senate. *Id.* at § 171.01. All of these demonstrate a relatively significant ability for Ohio to exercise control over OPERS.

  Plaintiff argues that the Ohio Revised Code demonstrates that Ohio does not consider OPERS as an "arm of the State." Plaintiff relies on Ohio Revised Code § 102.01(C)(1), which provides the definition of "public agency." "Public agency" is defined as:

> [T]he general assembly, all courts, any department, division, institution, board, commission, authority, bureau or other instrumentality of the state, a county, city,

> village, or township, the five state retirement systems, or any other governmental
> entity.

Ohio Rev. Code Ann. § 102.01(C)(1). Plaintiff urges this Court to apply the canon of construction *noscitur a sociis*, arguing that because "the five state retirement systems" is listed separately from "instrumentality of the state," Ohio law does not consider OPERS to be an instrumentality—or "arm"—of the State.[2] Further, Plaintiff argues that because OPERS is listed after a series of political subdivisions, it too is more akin to a political subdivision than an "arm of the State." (Pl. Resp. at 5–6, ECF No. 14 at PageID # 5–6.) OPERS argues that this logic results in an incorrect interpretation of Ohio Revised Code § 102.01(C)(1). (OPERS's Mot. at 1–2, ECF No. 18 at PageID # 92–93.)

The Court views Ohio Revised Code § 102.01(C)(1) as a mere list of entities considered "public agencies" for purposes of Ohio ethics laws and nothing more. The Court agrees with OPERS's argument that § 102.01(C)(1) was not drafted with the Eleventh Amendment in mind, as some entities listed in § 102.01(C)(1) are clearly entitled to Eleventh Amendment immunity (the General Assembly), and others are clearly not (political subdivisions). In light of the multiple revised code provisions specifically addressing the ways Ohio can exercise control over OPERS, the Court does not find that this one provision, standing alone, demonstrates an intention to make OPERS a political subdivision.

Accordingly, the Court finds that these factors weigh in favor of holding OPERS is an "arm of the State."

---

[2] Plaintiff and Defendants agree that OPERS is one of the "five state retirement systems" defined in Ohio Revised Code § 102.01(C)(1). (Pl. Resp. at 5, ECF No. 14 at PageID # 81; OPERS Reply at 1, ECF No. 18 at PageID # 92.)

### 3.    Whether State Officials Appoint OPERS Board Members

Third, the Court considers whether state officials appoint OPERS's board members. The Board is vested with the administrative and managerial duties of OPERS. Ohio Revised Code § 145.04. Ohio law requires four of 11 OPERS trustees to be appointed by the State of Ohio, including three investment experts appointed by the State Treasurer, Governor, and General Assembly, respective, as well as the Director of the Department of Administrative Services. Ohio Rev. Code Ann. § 145.04. The remaining Board members are elected by groups of beneficiaries of OPERS, including state employees, county employees, municipal employees, college/university employees, miscellaneous employees, and two representatives for retirees. *Id.* Additionally, the Board must submit its operating budgets and public information plans to the Ohio retirement study council. Ohio Rev. Code Ann. § 145.092(D). The Ohio retirement study council consists of three Ohio Senators, three Ohio Representatives, and three members appointed by the Ohio Governor with the advice and consent of the Ohio Senate. Ohio Rev. Code Ann. § 171.01. Like the STRB in *Dennis*, this demonstrates additional state oversight of OPERS. *Dennis v. State Tchrs. Ret. Bd.*, No. 1:19-CV-386, 2021 WL 3630513, at *7 (S.D. Ohio Aug. 17, 2021).

Although not all OPERS Board members are appointed by the state, the added layer of state oversight through the Ohio retirement study council weighs in favor of finding OPERS as an arm of the State of Ohio. Considering the makeup of the Board, as well as the additional layers of State oversight of the Board, this factor weighs in favor of OPERS's status as an "arm of the State."

### 4.    Whether OPERS's Functions Fall within the Traditional Purview of State or Local Government

Fourth, the Court considers whether OPERS's functions are within the traditional purview of state government. In ruling that Michigan's retirement system for state-court judges and other

17

state officials falls within the traditional purview of state government, the Sixth Circuit provided the following analysis:

> But when, as in this case, the retirement system is funded by annual appropriations from the state legislature, operates in part through the Michigan Treasury and in part through the State's Department of Management and Budget, operates on a statewide basis and serves the officers of one of three essential branches of state government (the judiciary) as well as several other state-wide officials, it is fair to say that the retirement system performs a traditional state function.

*Ernst*, 427 F.3d at 361.

Applying these same considerations here demonstrates that OPERS performs a function within the traditional purview of state government. While OPERS is not funded by annual appropriations from the state legislature, the other *Ernst* considerations apply to OPERS. OPERS's statutory scheme specifically contemplates payments from Ohio's Treasury, it receives funds from employees and employers throughout the state, and it distributes retirement benefits to public employees throughout the state. OPERS's statewide nature is particularly indicative of a state function, not a local one. Accordingly, this factor weighs in favor of immunity for OPERS.

Weighing the four *Ernst* factors as applied to this case demonstrates that OPERS is an "arm of the State" entitled to Ohio's Eleventh Amendment sovereign immunity. Because OPERS is entitled to Ohio's sovereign immunity, Plaintiff cannot advance her ADA and FMLA claims against OPERS in federal court. Accordingly, the Court dismisses Plaintiff's Count I, III, and V against OPERS on sovereign immunity grounds.

### C.    Plaintiff's Remaining State Law Claims against OPERS

Plaintiff alleges two claims—Counts II and IV—against OPERS arising from alleged violations of Ohio's FEPA. While the Ohio General Assembly has waived sovereign immunity for OPERS in state court, such a waiver does not constitute consent to be sued in federal court. Ohio Rev. Code Ann. § 145.101 ("Any action brought against the public employees retirement

system or the public employees retirement board or its officers, employees, or board members in their official capacities shall be brought in the appropriate court in Franklin county, Ohio."); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd*., 527 U.S. 666, 676 (1999) (holding that a state does not "consent to suit in federal court merely by stating its intention to 'sue and be sued'"). Accordingly, Ohio has not waived its sovereign immunity in federal court.

Because the Court lacks subject matter jurisdiction over Plaintiff's claims against OPERS, the Court dismisses Counts II and IV without prejudice. *See Dennis*, 2021 WL 3630513, at *8.

## II.     Individual Defendants' Motion for Judgment on the Pleadings

The Court now turns to the Individual Defendants' Motion for Judgment on the Pleadings. The Individual Defendants' Motion raises four primary arguments: (1) Ohio's Employment Law Uniformity Act ("ELUA") eliminated individual liability for managers and supervisors acting in the course and scope of their employment; (2) the FMLA does not impose individual liability on employees of a public agency; (3) if the claims against the Individual Defendants state plausible claims for individual liability, the Court lacks subject matter jurisdiction over the claims; and (4) the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. (ECF No. 13, at PageID # 70–75.)

Because failure to state a claim for violation of the FMLA would obviate the need for this Court to reach Plaintiff's state law claims, the Court first considers Plaintiff's FMLA claim against the Individual Defendants. The Court then addresses Plaintiff's state law claims.

### A.     Plaintiff's FMLA Claim Against the Individual Defendants

Plaintiff's Count V alleges that the Individual Defendants violated the FMLA. (Compl. at 10, ECF No. 1 at PageID # 10.) Plaintiff's Complaint does not specify whether she is suing the Individual Defendants in their individual or official capacity. While the Parties' briefing only

19

addressed individual liability for the Individual Defendants, Plaintiff does not state that she is suing the Individual Defendants *only* in their individual capacities, and thus the Court must presume that they are also being sued in their official capacities. *See Boyd v. Myers*, 173 F.3d 428 (6th Cir. 1999) ("If a plaintiff does not affirmatively plead the capacity in which he is suing state defendants, they will be considered as sued in their official capacities . . . .") (citing *Wells v. Brown*, 891 F.2d 591, 593-94 (6th Cir. 1989)).

To the extent Plaintiff seeks money damages for violations of the FMLA from the Individual Defendants—regardless of whether Count V is brought against them in their individual or official capacities—the Sixth Circuit has held that such a claim is barred. *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *Mitchell v. Chapman*, 343 F.3d 811, 829 (6th Cir. 2003) ("[E]xamination of the FMLA's text and structure reveals that the statute does not impose individual liability on public agency employers."). Accordingly, to the extent Count V seeks money damages, it is dismissed.

To the extent Plaintiff seeks prospective injunctive relief against the Individual Defendants in their official capacity, however, her claim may proceed. Claims against state officials seeking injunctive relief of reinstatement for violations of the FMLA are not barred by sovereign immunity. *Diaz*, 703 F.3d at 966. Here, Plaintiff seeks reinstatement. (Compl. at 11–12, ECF No. 1 at PageID # 11–12.) Specifically, Plaintiff requests an "order requiring OPERS to restore [her] to one of the positions to which she was." (*Id.*) Additionally, Plaintiff states she is "entitled to all damages provided for in 29 U.S.C. § 2617."[3] (*Id.* at ¶ 127, PageID # 10.) This claim seeking reinstatement is not barred by sovereign immunity.

---

[3] Plaintiff specifically identifies "damages" within her FMLA claim, but 29 U.S.C. § 2617 also provides injunctive relief as a remedy. Because Plaintiff also requests injunctive relief of

Accordingly, the Individual Defendants' Motion for Judgment on the Pleadings regarding Count V is denied to the extent Plaintiff seeks prospective, injunctive relief of reinstatement against the Individual Defendants in their official capacities.

### B.  Plaintiff's State Law Claims Against the Individual Defendants

In Counts IV and VI, Plaintiff alleges unlawful retaliation and aiding, abetting, and inciting of discrimination in violation of Ohio Revised Code § 4112.02(I)–(J).  Ohio Revised Code § 4112 is the Ohio FEPA.  The Individual Defendants argue that Counts IV and VI fail because Ohio's FEPA does not permit suits for individual liability, relying on recent amendments the Employment Law Uniformity Act ("ELUA") made to FEPA.  (Individual Def. Mot at 4–5, ECF No. 13 at PageID # 70–71.)  Plaintiff counters that the ELUA absolved liability for employers for claims brought pursuant to Ohio Revised Code § 4112.02(A)–(F), but not for claims under § 4112.02(I)–(J).  (Pl. Resp. at 3–4, ECF No. 15 at PageID # 86–87.)  Plaintiff focuses her argument on changes to the definition of "employer," specifically where ELUA removed "any person acting directly or indirectly in the interest of an employer" from the definition of "employer."  (*Id.*)  Plaintiff notes that § 4112.02(A)–(F) imposes liability on "any *employer*," while § 4112.02(I)–(J) imposes liability on "any *person*."  (*Id.*) (emphasis added).  Accordingly, Plaintiff argues that ELUA did not change § 4112.02(I)–(J).  (*Id.*)

While ELUA changed the definition of "employer," ELUA also specified that supervisors and managers cannot be held liable for unlawful discriminatory practices relating to employment.  In full, the key portion of Ohio Revised Code § 4112.08(A) states:

> However, **no person has a cause of action or claim based on an unlawful discriminatory practice relating to employment described in division (A)(24)(a) of section 4112.01 of the Revised Code against a supervisor,**

---

reinstatement in her demand for relief, the Court will construe her request for damages as a request for all remedies available under 29 U.S.C. § 2617.

> **manager**, or other employee of an employer unless that supervisor, manager, or other employee is the employer. Nothing in this division abrogates statutory claims outside this chapter or any claims of liability that exist against an individual at common law.

Ohio Rev. Code Ann. § 4112.08(A) (emphasis added).  Ohio Revised Code § 4112.01(A)(24)(a) defines "unlawful discriminatory practice relating to employment" as an unlawful discriminatory practice prohibited by § 4112.02(A)–(F), and an unlawful discriminatory practice prohibited by § 4112.02(I)–(J) related to employment.  Accordingly, supervisors and managers cannot be held individually liable for employment discrimination or retaliation.  *Reeves v. P&E Logistics, Inc.*, No. 2:21-CV-4167, 2022 WL 899688, at *3 (S.D. Ohio Mar. 28, 2022).

Plaintiff's claims for violation of Ohio Revised Code § 4112.02(I) and (J) are barred by the ELUA's amendments to § 4112.08(A).  Here, Plaintiff alleges that the Individual Defendants were supervisors and managers for OPERS.  (Compl. at ¶¶ 5, 7, ECF No. 1 at PageID # 2.)  Accordingly, the Individual Defendants are "supervisors" and "managers" within the meaning of Ohio Revised Code § 4112.08(A).  Plaintiff alleges she was retaliated against in her employment for requesting an accommodation, and that the Individual Defendants' actions constitute aiding, abetting, and inciting discrimination.  All of Plaintiff's claims relate to allegedly unlawful actions regarding her request for an accommodation at work, use of medical leave from work, and employment termination.  (*See generally* Compl., ECF No. 1.)  Thus, Plaintiff's § 4112.02(I) and (J) claims concern allegedly unlawful discriminatory practices relating to her employment.  Counts IV and VI regarding the Individual Defendants are prohibited by Ohio Revised Code § 4112.08(A), and the Court dismisses them for failure to state a claim.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** OPERS's Motion for Judgment on the Pleadings (ECF No. 12).  The Court **GRANTS** the Individual Defendants' Motion for Judgment

on the Pleadings (ECF No. 13) regarding Counts IV and VI, **GRANTS** the Individual Defendants'
Motion regarding Count V to the extent it seeks money damages, and **DENIES** the Individual
Defendants' Motion regarding Count V to the extent it seeks prospective, injunctive relief of
reinstatement against the Individual Defendants in their official capacities.

This case shall remain open.

**IT IS SO ORDERED.**

**9/28/2023**                                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                                         **EDMUND A. SARGUS, JR.**
                                                                 **UNITED STATES DISTRICT JUDGE**